IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

PARIS LaPRIEST POWELL,            )
                                  )
            Plaintiff,            )        Case No. CIV-2010-01294 D;
                                  )        Case No. CIV-2010-01295 D
vs.                               )
                                  )
(1) ROBERT BRADLEY MILLER,        )
individually, (2) ROBERT BRADLEY  )
MILLER, in his official capacity; )
(3) THE STATE OF OKLAHOMA;        )
(4) DURBIN, LARIMORE and          )
BIALICK, a professional corporation; )
                                  )
            Defendants.           )
_____ )
                                  )
YANCEY LYNDELL DOUGLAS,           )
                                  )
            Plaintiff,            )
                                  )
vs.                               )
                                  )
(1) ROBERT BRADLEY MILLER,        )
individually, (2) ROBERT BRADLEY  )
MILLER, in his official capacity; )
(3) THE STATE OF OKLAHOMA;        )
(4) DURBIN, LARIMORE and          )
BIALICK, a professional corporation; )
                                  )
            Defendants.           )

## O R D E R

Before the Court are the motions for summary judgment of Plaintiff Paris LaPriest

Powell ("Powell") [Doc. No. 97, Case No. CIV-2010-1294-D], and Defendant Robert Bradley

Miller ("Miller") [Doc. No. 94, Case No. CIV-2010-1294-D; Doc. No. 92, Case No. CIV-2010-

1295-D].[1]  Each party has filed respective response briefs [Docs. No. 104 and 106, Case No. CIV-2010-1294-D] and replies [Docs. No. 108 and 110, Case No. CIV-2010-1294-D],  and the motions are at issue.  This case arises out of the prosecution, conviction, and incarceration of Powell and Yancey Lyndell Douglas ("Douglas") for the 1993 shooting death of Shauna Farrow and wounding of Derrick Smith, as well as the Tenth Circuit's subsequent grant of their federal habeas petitions under *Brady v. State of Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Powell seeks judgment as a matter of law that Miller violated his constitutional right to due process under 42 U.S.C. § 1983 and is liable in negligence under both the Oklahoma Governmental Tort Claims Act ("GTCA"), OKLA. STAT. tit. 51 § 151 *et seq.*, for acts in his official capacity and under common law for acts in his individual capacity.  In his cross motion for summary judgment, Miller maintains Powell's § 1983 claim fails as a matter of law because there is no proof of state action.  For the reasons stated below, the Court denies both parties' motions.

---

[1]Miller's summary judgment motions are identical but filed separately in each case.  In a separate Order (*see* n. 2, *infra*), the Court denied the motion for summary judgment of Plaintiff Yancey Lyndell Douglas against Defendant State of Oklahoma ("State") on negligence grounds and granted State's opposing motion, holding Plaintiffs' negligence claims against State fail as a matter of law.

## Background and Procedural History[2]

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 alleging Defendants violated Plaintiffs' constitutional rights in connection with Plaintiffs' murder convictions in Oklahoma County and their subsequent incarceration.[3] Plaintiffs also assert pendent state law claims for negligence and malicious prosecution based on their allegedly wrongful criminal convictions.[4] They contend that Miller, the Oklahoma County assistant district attorney who prosecuted each of them, wrongfully procured their convictions by suborning perjury and suppressing exculpatory evidence. Plaintiffs further allege Miller took active steps in the years following their convictions to ensure such perjured testimony and exculpatory evidence remained concealed. Specifically, Plaintiffs insist Miller induced a witness, Derek Smith ("Smith"), who was wounded in the shooting, to falsely identify Plaintiffs as the perpetrators of the crimes and that, in return for Smith's trial testimony, Miller agreed to assist Smith in obtaining favorable treatment in an upcoming parole hearing as well as in any future criminal matters.[5]

---

[2]The Court incorporates by reference herein its more complete procedural history as set forth in its Order entered on March 30, 2015 [Doc. No. 138, Case No. CIV-2010-1294-D and Doc. No. 123, Case No. CIV-2010-1295-D] and thus will not repeat that discussion here.

[3]State charged each Plaintiff with both first degree malice murder and shooting with intent to kill for the June 25, 1993 drive-by shooting death of Shauna Farrow and wounding of Derrick Smith. The cases were severed for trial. In July 1995, Douglas's jury convicted him on both counts and imposed the death penalty for first degree malice murder and life imprisonment for shooting with intent to kill. Almost two years later, in May 1997, Powell's jury likewise convicted him on both counts and imposed identical sentences.

[4]The Court earlier dismissed Plaintiffs' malicious prosecution claims against State. *Douglas v. Miller,* 864 F.Supp.2d 1205, 1221 (W.D.Okla. 2012) and *Powell v. Miller*, No. CIV-10-1294-D, 2013 WL 160790, at *2 (W.D.Okla. Jan. 14, 2013).

[5]Although Plaintiffs were tried separately, Smith testified in both trials as the lone purported eye witness to Plaintiffs' alleged crimes.

Plaintiffs also allege that, following their convictions and while he was still in State's employ, Miller took steps to fulfill his part of the agreement with Smith by influencing other prosecutors to file reduced charges or otherwise secure leniency for Smith in criminal matters unrelated to Plaintiffs' cases.[6] Plaintiffs insist Miller's purpose in so doing was to ensure Smith would continue to conceal the false nature of his trial testimony as well as both the fact and nature of his *quid pro quo* with Miller. Plaintiffs further contend Miller persisted in this wrongful conduct after he left the Oklahoma County District Attorney's office for private practice at the law firm of Durbin, Larimore and Bialick in December, 1998.[7] Plaintiffs maintain that without Smith's testimony, Miller would have had insufficient evidence to continue his prosecution or justify their continued incarceration.[8]

In an affidavit dated May 24, 2001, Smith recanted his identification of Douglas and Powell as the shooters and asserted, contrary to his denials at each trial, that he had received Miller's assistance in exchange for his testimony.

In affirming and granting habeas relief, the Tenth Circuit found, *inter alia*, that Plaintiffs' convictions were based on Smith's false testimony; Miller failed to correct Smith's false statements at trial; a tacit testimony-for-intervention agreement existed between Miller and

---

[6]The Tenth Circuit discussed the evidence reflecting the assistance Miller provided to Smith after Plaintiffs' convictions and indicated Miller continued to assist Smith until 2002. *Douglas v. Workman*, 560 F.3d 1156, 1165-67 (10th Cir. 2009).

[7]This Court earlier granted the law firm's motions to dismiss all claims against it. *See Douglas v. Miller*, No. CIV-10-1295-D, 2012 WL 1066129, at *8 (W.D.Okla. March 29, 2012) and *Powell v. Miller,* No. CIV-10-1294-D, 2013 WL 161143, at *2 (W.D.Okla. Jan. 14, 2013).

[8]After reviewing the entire state trial record, the Tenth Circuit concluded that "[h]ad the jury discounted Smith's testimony as not credible, it almost certainly would not have had sufficient evidence on which to convict." *Douglas v. Workman*, 560 F.3d at 1174.

Smith, which Miller both failed to disclose at trial and took active steps to conceal thereafter; and Miller failed to produce certain other potentially exculpatory materials to defense counsel. The Tenth Circuit concluded Miller's misconduct was willful and intentional, violated *Brady v. State of Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and was "akin to a fraud on the federal habeas courts." *Douglas v. Workman,* 560 F.3d 1156, 1192-93 (10th Cir. 2009). After sixteen years of incarceration, the Oklahoma County District Attorney dismissed murder charges against Douglas and Powell on October 2, 2009 and, citing insufficient evidence, declined to retry either Plaintiff.

With respect to previous summary judgment proceedings, in a prior Order the Court denied Douglas's motion for summary judgment on State's liability in negligence and granted State's opposing motion, holding State is not liable in negligence to either Plaintiff as a matter of law.[9] In the instant motions, Powell moves for summary judgment against both State and Miller on the issue of negligence. Like Douglas, Powell insists that because the Oklahoma Supreme Court in disciplinary proceedings against Miller accepted as true all facts material to Plaintiffs'

---

[9]In its previous Order (Doc. No. 138, Case No. CIV-2010-1294-D and Doc. No. 123, Case No. CIV-2010-1295-D) the Court states at p. 14 that the "undisputed lack of an actual-innocence finding is a failure of proof that precludes [Plaintiffs'] wrongful-conviction-based negligence claims against State," yet in the conclusion of that Order and elsewhere, the Court references only Plaintiff Douglas's motion for summary judgment. The Court's language was imprecise; however, as set forth herein, Plaintiffs' summary judgment arguments vis-a-vis State are substantially similar and rely on the same collateral estoppel assertion; thus the Court's adjudication of Plaintiff Douglas's motion for judgment as a matter of law against State in negligence is equally applicable to Plaintiff Powell's motion. Further, the grant of summary judgment in favor of State as against both Plaintiffs on their negligence claims necessarily implies the denial of Plaintiff Powell's motion for summary judgment on the same claims. Nevertheless, Powell's motion is expressly denied herein.

negligence claims, the doctrine of collateral estoppel applies to prevent the relitigation of the negligence issue. Powell also seeks judgment as a matter of law that Miller is liable for civil rights violations under 42 U.S.C. § 1983. Miller, for his part, advocates the opposite conclusion in his motion, insisting Powell cannot show the requisite state action to establish a § 1983 claim and Miller is thus entitled to summary judgment on Plaintiffs' civil rights claims.

## Undisputed Facts[10]

On July 7, 1995, the day after Douglas's murder trial concluded with the jury sentencing him to death, Miller wrote a letter to the Oklahoma Pardon and Parole Board urging it to grant pre-parole status to Smith on the ten-year sentence he was serving for an earlier cocaine-trafficking charge, Oklahoma County Case No. CF-92-6772.[11] In the letter, Miller declares his "office gave [Smith] no special treatment in his case. However, [Smith] was required to testify at [the] preliminary hearing and the trial of Yancey Douglas. . . . [H]e has fully cooperated and truthfully testified in both instances." *See* Miller Letter [Doc. No. 97-3]. Miller further maintains that "[w]ithout Derrick [Smith], Douglas would probably not have been convicted"

---

[10]This statement includes material facts presented by both parties that are supported as required by Fed.R.Civ.P. 56(c)(1) or otherwise shown by the record. If a party has asserted a fact, or asserted that a fact is disputed, but has failed to provide necessary support, the assertion is disregarded.

[11]To assist with factual context, the Court has taken judicial notice throughout this Order of the publicly available court dockets from criminal actions against Smith to verify and supplement information regarding the record of Smith's criminal activity the parties provided in their pleadings and motions. See *United States v. Ahidley*, 486 F.3d 1184, 1192 n. 5 (10th Cir.2007) ("[W]e may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand."); *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir.1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system . . . ."); *see also* Fed.R.Evid. 201.

and that Smith "understands that he will be required to testify in Paris Powell's trial." *Id.* After stating his belief that Smith had "earned an opportunity to reintegrate into society," Miller closes the letter with, "I urge the Board to grant [Smith's] pre-parole status." *Id.* The parole board granted pre-parole status to Smith on October 24, 1995.

Eighteen months later, on April 20, 1997, a few weeks in advance of Powell's murder trial, Smith, who was back in the custody of the Oklahoma Department of Corrections ("ODOC") at the time, wrote the following letter to his mother asking her to contact Miller about Smith's confinement:

> What's up moma  Have you been calling cuz?  probley not man call O dude an get that hook up to werr I can come home from the county jail or tell him he's short because i ain't gone let him put me in the cross again like he did last time, but he ain't gone do shit if you don't continue to call him and let him know whats going on it's fifteen days before the tiral starts and i don't wanna be up on that county jail if he ain't talking write tellem, I want 365 days for helping the state to kill some body cause that's what he plans to do.  Plus send me some money daddy was suppose to have sent 25 dollars 3 months ago a nigga ain't got no money but Ima let you'll go. stay own brad miller and I'll holler at you'll later love darric

*See* Smith Letter [Doc. No. 97-5] (errors in original).  Three days later, on April 23, 1997, Miller called David Petite, an ODOC sentence administration officer, and wrote the following notes from their conversation: "Warden Ron Ward"; "Derrick Smith"; "coop credits"; and "with credits ➜ 225 days = 11/11/97."  *See* Miller Message [Doc. No. 106-1] at p. 9.

During Powell's murder trial, which commenced one week after Miller's conversation with Petite regarding Smith's sentence, Smith once again positively identified Douglas and Powell as the shooters.  Miller elicited testimony from Smith to the effect that Smith was receiving nothing in return for his participation as a witness.  In his closing argument to the jury,

Miller declared Smith "went to prison in his own case and never asked for a thing . . . . [a]nd nobody interceded because he didn't want it that way." *See* Transcript Excerpt of Closing Argument [Doc. No. 97-4]. On May 20, 1997, Powell's jury convicted him on both counts and imposed the death penalty for first degree malice murder and life imprisonment for shooting with intent to kill. Miller admits he never corrected any of the statements he and Smith made to either the jury or the court in Powell's case.

On June 22, 1997, approximately one month after the conclusion of the Powell trial, Smith wrote a letter to Warden Bobby Boone of ODOC's Alford Correctional Center stating "Brad Miller the State DA should have notified you by now" regarding Smith's lost earned credits. *See* Smith Letter [Doc. No. 106-2] at p. 6. On June 27, 1997, Warden Boone responded to Smith by letter, confirming Miller had called him regarding Smith's situation but informing Smith the "meritorious earned credit policy . . . was not intended for a reward for testifying in felony cases," so no merit days would be awarded. *See* Boone Letter [Doc. No. 106-2] at p. 8. Warden Boone did, however, promise to give "serious consideration to the restoration of lost [earned] credits which would discharge [Smith's] sentence." *Id.* On July 24, 1997, Warden Boone approved the restoration of 400 days' credit, effectively discharging Smith's sentence. *See* ODOC Intra-facility Assignment Form [Doc. No. 106-2] at p. 9.

Smith was arrested shortly thereafter for the October 17, 1997 shooting of Joe Shells and charged with assault with a dangerous weapon in Oklahoma County Case No. CF-98-1545. The charges against Smith were later dismissed, purportedly due to insufficient evidence of identification. In February 1998, Smith was charged in Oklahoma County Case No. CF-98-1162 with using a vehicle to facilitate intentional discharge of a firearm. The charges against Smith

were again dismissed, this time due to lack of cooperation from the victims.  Subsequently, on

May 17, 1999, Smith allegedly beat his girlfriend with a baseball bat and was charged in

Oklahoma County Case No. CF-99-3338 with felonious assault and battery with a deadly or

dangerous weapon.[12]  His January 2001 conviction yielded a fifteen-year sentence.

On March 8, 2000, before his assault and battery trial, Smith was arrested and charged in

Oklahoma County Case No. CF-00-1683 with trafficking in crack cocaine.  Even though he was

no longer an assistant district attorney at the time, Miller admits he contacted Clayton Niemeyer

("Niemeyer"), the assistant district attorney in charge of the case, to inform him that Smith was

helpful and cooperative in a capital homicide and partially responsible for Douglas and Powell

being on death row.  Miller acknowledges, and documentary evidence shows, Smith's initial

recommended sentence on the drug charge was thirty years.  While Miller insists he did not ask

or tell Niemeyer to do anything, an undated, hand-written note in the case file states, "Derrick

Smith 5 to do based on cooperation w/ B. Miller in Yancy [sic] Douglas murder."  *See* Case File

[Doc. No. 106-1] at p. 16.  Although Miller provides some support for the fact that Niemeyer

used his sole discretion in deciding the nature of the plea deal to offer Smith, the same record

evidence indicates Niemeyer remembers the gist of Miller's communication being, "[Smith]

helped, we couldn't have done it without him, you know, can you cut him a break?"  *See*

Niemeyer Testimony [Doc. 92-4] at pp. 8-9.  On March 21, 2001, Smith pled guilty to reduced

charges of possession with intent to distribute and acquiring and concealing proceeds derived

from violation of the Uniform Controlled Dangerous Substances Act, OKLA. STAT. tit. 63 § 2-

503.1, and was sentenced to five years in ODOC custody to run concurrently with his fifteen-

---

[12]When arrested for this crime, Smith was using the alias William Louis McCollum.

year sentence for assault and battery in CF-99-3338.[13]

While in custody for the assault and battery charge, Smith was arrested for murder stemming from a robbery in Wichita Falls, in Texas Case No. 38-193-6.[14]  Miller admits he contacted then-assistant district attorney Shannon Henson ("Henson"), whom he knew to be a former resident of Wichita Falls, to get information on the charges against Smith and to remind Henson that Smith had cooperated with Miller in the Douglas and Powell cases.  Following Miller's phone call, Henson contacted the Wichita Falls district attorney's office and reported back to Miller.  Although Miller provides support for the fact that Henson did not ask the Wichita Falls prosecutor for any favors or intervention on Smith's behalf, Henson reveals in the same record evidence, "I thought when I first talked to [Miller], he was still in the DA's office."  *See* Henson Testimony [Doc. No. 92-4] at pp. 1177-78.  Smith later entered a plea to the lesser charge of aggravated robbery and was sentenced to twelve and a half years to run concurrently with his sentence in CF-99-3338, the assault and battery case, and CF-00-1683, the drug case.

On May 24, 2001, Smith executed an affidavit recanting his identification of Douglas and Powell as the shooters and asserting he had received Miller's assistance in exchange for his testimony, contrary to his denials at both trials.  *See* Smith Affidavit [Doc. No. 106-2] at pp. 1-4.  Specifically, Smith asserted that he told Miller he was unable to identify any of the shooters that night because he was high on marijuana, drunk on grain alcohol, and it was dark outside at the time.  He swore his initial identification of Powell was based on a statement someone made at

---

[13]The Tenth Circuit Court of Appeals concluded "[t]his unusually lenient sentence was a result of Miller's call to the prosecuting district attorney."  *Douglas v. Workman*, 560 F.3d at 1167, *citing* Evid. Hr'g Ex. 32 (aff. of Michael S. Johnson, Smith's counsel in the drug case).

[14]Smith was again using the alias William Louis McCollum at the time.

the scene, rather than on his own identification. Smith stated he told Miller he could not identify either Powell or Douglas and would not testify against them unless Miller provided assistance on Smith's then-pending trafficking case. Smith further declared it was at his request that Miller contacted the parole board in 1995 and Warden Boone in 1997 to secure Smith's release from prison. Miller's assistance continued after the conclusion of both trials, according to Smith's affidavit, including when Miller dismissed assault charges against Smith in 1998 under threat by Smith that he would reveal his perjury in Plaintiffs' murder trials.

## Summary Judgment Standard

Summary judgment is proper "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id.* at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Id.* If a party who would bear the burden of proof at trial lacks evidence on an essential element of a claim, then all other factual issues concerning the claim become immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Movants for summary judgment bear the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Silverstein v. Federal Bureau of Prisons*, 559 Fed.Appx. 739, 752 (10th Cir. 2014); *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). If the movant carries this initial burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be

admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *Adler*, 144 at 671. To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein. *See* Fed.R.Civ.P. 56(c)(1)(A)*; see also Adler*, 144 F.3d at 671. "The court need consider only the cited materials, but may consider other materials in the record." *See* Fed.R.Civ.P. 56(c)(3); *see also Adler*, 144 F.3d at 672. The Court's inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## Discussion

### A.      Powell's Negligence Claims

Powell seeks judgment as a matter of law against both State and Miller in negligence. Concerning Powell's claim against State, the Court adopts and incorporates the same reasoning and reaches the same conclusion as it did in its Order denying Douglas's negligence claim and, for these reasons, the Court denies Powell's motion for summary judgment against State on the issue of negligence. *See* discussion, *supra* n. 9.

In order to support a claim for negligence against Miller individually, Powell "must show the existence of a duty on the part of the defendant to protect plaintiff from injury, a breach of the duty, and an injury to plaintiff proximately resulting from the breach." *Tuffy's, Inc. v. City of Okla. City*, 212 P.3d 1158, 1167 (Okla. 2009). The showing regarding these elements which Powell sets forth in his summary judgment brief reads in its entirety:

> Defendant Miller's duty toward Mr. Powell is established by the *Brady* and *Giglio* cases. The breach is established by Mr. Miller's own admission that he did nothing to provide the necessary information. Exhibit 7. The injury is established by the fact that

> once the correction was made, the State had no case left.  Exhibits
> 1 and 2.[15]

*See* Powell's Motion at pp. 5-6.

It is well established under *Brady* that prosecutors have a constitutional duty to disclose exculpatory evidence to criminal defendants.  *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196-97.  In addition, the Supreme Court's *Giglio* decision makes it clear such evidence includes the existence of benefit-for-testimony agreements between witnesses and prosecutors.  *Giglio v. United States*, 405 U.S. at 154-55, 92 S.Ct. at 766.  Thus, the evidence Powell presents satisfies the "existence of a duty" prong of a negligence claim.  The indisputable fact that Powell spent sixteen years in prison is likewise sufficient to establish the injury element of Powell's *prima facie* negligence case.

The question thus becomes whether the evidence Powell presents in support of the second prong of the claim, that Miller breached the duty he owed to Powell, is so one-sided that Powell must prevail as a matter of law on his negligence claim.  The breach-of-duty evidence on which Powell relies is the following excerpt from Miller's deposition addressing his communications with Smith:

> Q [BY MR. BARRET]:  So would it be a fair summary then to say that you believed that
> he said that, but he may not have meant that?
> MR. ABOWITZ:  Object to the form.
> MR. MANN:  Object to the form.
> A [BY MR. MILLER]:  No.  It would be a fair summary to say that I believed he said it
> and I needed to find out what it was about.

---

[15]Exhibit 1 is the docket sheet from Powell's murder trial showing he was sentenced to death on May 20, 1997.  Exhibit 2 includes two minute entries dated October 2, 2009 documenting that Powell and Douglas were released and the cases against them dismissed due to insufficient evidence.  Exhibit 7, the evidence that purportedly shows Miller's breach of his duty to Powell, is an excerpt from Miller's March 14, 2014 deposition.

Q:      You believe that he said he wanted help, but you don't necessarily believe that he meant he wanted help?

A:      When his – whoever gave this to me represented that he wrote this letter to his mama, I believed that that was true, at least likely.

Q:      And when you say "that that was true," is that he was saying that he wanted help?

A:      That he wrote this letter.  Okay.

Q:      I'm handing you what's been marked as Deposition Exhibit 7.  Do you need a second to read that?

A:      Yes.  Can you tell me what this is out of?

Q:      Mr. Powell's trial, Derrick Smith's testimony.

A:      Okay.  You want me to read the whole thing, right?

Q:      Yes.

A:      All right.  I've read it.

Q:      Is that consistent with your memory of Mr. Smith's testimony at Mr. Powell's trial?

A:      Yes.

Q:      Did you ever tell the jury or the court in any way that that testimony was incorrect?

A:      My understanding of this testimony is that Derrick is saying that I did not have anything to do with helping him in any way or influence in any way his dope conviction.  Is that what you think he's talking about?

Q:      I think it speaks for itself, as you said.

A:      We all say that a lot.  But, okay, let me just tell you that I think it's talking about the drug case that he had that Hurst Jones represented him on, as you mentioned earlier, that Hurst testified to in the Douglas trial apparently.  Do I think this is accurate?  I do think this is accurate.

Q:      But whether or not you think it was accurate, you never said anything to the jury or to the court contrary to that testimony?

A:      I don't remember.  I don't think so.

Q:      I want to hand you what's been marked as Deposition Exhibit 8 which I'll represent to you is also out of the Powell case.

A:      I'll have to say I don't even know what I meant by "whacked." But other than that, I've read it.

Q:      Is that consistent with your memory of what you said in Mr. Powell's case?

A:      I mean, I don't remember, but I'm not challenging it.

Q:      Did you ever say anything to the jury or to the court to correct any of the statements in Deposition Exhibit 8?

A:      No.  I don't think so.

*See* Miller Deposition [Doc. No. 97-6] at pp. 64-66.

Powell insists the cited deposition testimony amounts to an admission by Miller that he gave false information to the jury and the trial court concerning the assistance he provided Smith

prior to Powell's trial and that he never corrected that misinformation. The quoted language appears to relate only to the time of Powell's trial, when Miller was still in State's employ. To the extent Powell premises his negligence claim against Miller on actions Miller undertook while prosecuting Powell, it is properly viewed as an action against State. *Douglas v. Miller*, 864 F.Supp.2d 1205, 1220, n.6 (W.D. Okla. 2012) (citing *Speight v. Presley*, 203 P.3d 173, 179 (Okla. 2008)); *see also Pellegrino v. State ex rel. Cameron Univ.*, 63 P.3d 535, 537 (Okla. 2003) (reasoning "a tort claim brought against an employee in his or her official capacity [is viewed] as an attempt to impose liability upon the governmental entity, and thus the claim must be based upon the employee having acted within the scope of his or her employment."). As such, this aspect of the negligence claim Powell is attempting to assert against Miller would be subject to the same procedural constraints of the GTCA that served to bar his negligence claim against State.

The deposition testimony Powell cites could be interpreted to be an admission by Miller that he continued to cover up his alleged fraud upon the trial court after both the conclusion of Powell's murder trial and upon entering private practice, through continued assistance to Smith. At that point in time, because Miller was no longer employed by State, this testimony could support a negligence claim against Miller individually. But the cited testimony also is subject to more than one interpretation. Indeed, a reasonable jury could conclude it simply shows Miller agreed with Smith's declaration at trial that Miller had no involvement in or influence over the drug trafficking case that predated Miller's first meeting with Smith. Viewing the testimony in the light most favorable to Miller, the non-moving party, the Court concludes it is not "so one-sided" that a jury could reach "but one reasonable conclusion," namely, that Miller breached his

duty toward Powell, and Powell must prevail on his negligence claim as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). For these reasons, the Court denies Powell's motion for summary judgment against Miller on the issue of negligence.[16]

**B.      42 U.S.C. § 1983**

Two subsets of Powell's § 1983 claims, barred neither by absolute nor qualified immunity, survived Miller's motion to dismiss: (1) those founded on Miller's post-trial actions while still a State employee in which he did not act as an advocate for State; and (2) those based on Miller's alleged efforts on Smith's behalf after Miller left the District Attorney's office. *Douglas v. Miller*, 864 F.Supp.2d at 1215-16. By limiting his argument to the second category of claims, Miller's motion is properly viewed as one for partial summary judgment. Miller insists Powell's claim fails as a matter of law as it pertains to Miller's actions after he left State's employ because there is an absence of evidence to demonstrate Miller was acting under color of law when he contacted officials in Oklahoma and Texas to secure leniency for Smith.

Conversely, Powell argues he is entitled to summary judgment on his § 1983 claim because the undisputed facts show Miller failed to disclose during trial that he had provided assistance to Smith in exchange for his testimony in the Douglas case; that Miller continued to withhold such evidence following the conviction both while employed by State as a prosecutor

_____

[16]No other evidence on the issue of negligence is presented for purposes of summary judgment. Miller fails to identify the existence of genuine issues of material fact in response to Powell's motion as to this claim. Instead, Miller cites well-established case law that negligence is insufficient to support a § 1983 claim for relief. *See* Miller's Response at pp. 12-13. In so doing, Miller fails to acknowledge either the fact that Powell brings a negligence claims against Miller under state law or that Powell has moved for summary judgment on that claim.

and upon entering private practice; and Powell was convicted, sentenced to death, and spent sixteen years in prison as a result.

Criminal convictions obtained by presentation of known false evidence or by suppression of exculpatory or impeaching evidence violate the due process guarantees of the Fourteenth Amendment and are actionable under 42 U.S.C. § 1983. *Brady,* 373 U.S. at 87, 83 S.Ct. at 1196-97. This is because "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio*, 405 U.S. at 153, 92 S.Ct. at 766 (internal quotations omitted). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269, 79 S.Ct. at 1177.

Establishing a *Brady* violation requires proof of three elements: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936 (1999)). "Plaintiffs alleging a violation of § 1983 must demonstrate they have been deprived of a right 'secured by the Constitution and the laws of the United States,' and that the defendants deprived them of this right acting under color of law." *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000), *quoting Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 930, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Put another way, "[s]ection 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Howards v. McLaughlin*, 634 F.3d 1131, 1139 (10th Cir. 2011).

"[T]he only proper defendants in a § 1983 claim are those who represent [the state] in some capacity, whether they act in accordance with their authority or misuse it." *Gallagher v. "Neil Young Freedom Concert,"* 49 F.3d 1442, 1447 (10th Cir. 1995), (quoting *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988)) (internal quotation omitted). To implicate § 1983, the defendant's conduct must be "fairly attributable to the state." *Lugar,* 457 U.S. at 937. "[P]rivate conduct, no matter how discriminatory or wrongful" is excluded from the reach of § 1983's state-action requirement. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (quotations omitted).

The Tenth Circuit has identified four tests used to determine whether a private entity is acting under color of law and is thus subject to liability under § 1983: the nexus test, the public function test, the joint action test, and the symbiotic relationship test. *Wittner v. Banner Health*, 720 F.3d 770, 775 (10th Cir. 2013), citing *Johnson v. Rodrigues*, 293 F.3d 1196, 1202-03 (10th Cir. 2002). "If any one of the tests indicates a party is a state actor, that alone is sufficient to find the party a state actor." *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 596 (10th Cir. 1999). In their summary judgment briefs, both Powell and Miller have the joint action test as their primary focus and the Court agrees "the joint action test speaks most clearly to whether [Miller] acted as a state actor." *Id.* Under the joint action test, state action is present if a private party is a "willful participant in joint activity with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). "[T]he focus of this test is not on long-term interdependence between the state and a private entity" but on "whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights." *Gallagher*, 49 F.3d at 1453. "[T]he mere acquiescence of a state official in the actions of a

private party is not sufficient." *Id.*, *citing Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

Although "one way to prove willful joint action is to demonstrate that the public and private actors engaged in a conspiracy," a requirement of which "is that both public and private actors share a common, unconstitutional goal," *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1126 (10th Cir. 2000), evidence that private persons exerted influence over a state entity, substituted their judgment for the state entity, or participated in the decision leading to the deprivation of rights, is also sufficient to establish joint action in satisfaction of the "color of law" element of § 1983. *Beedle v. Wilson*, 422 F.3d 1059, 1071 (10th Cir. 2005); *see also Gallagher*, 49 F.3d at 1454 (joint action test may be satisfied where there is a "substantial degree of cooperative action between state and private officials . . . in carrying out the deprivation of the plaintiff's constitutional rights.") (internal quotations and citations omitted). "The actions of a former government employee, without more, cannot amount to state action," however; "[r]ather there must be some evidence of involvement by current government officials in the offending conduct." *Marsh v. County of San Diego*, 680 F.3d 1148, 1158 (9th Cir. 2012) (holding state prosecutor who had retired six years before sending autopsy photograph to the press cannot be said to have been acting under color of state law for purposes of § 1983 where plaintiff failed to allege participation by any person who was a government official at the time the photograph was published).

While the Tenth Circuit consistently has held citizens who merely make complaints or furnish information to police officers that result in arrests are not state actors (*see, e.g.,Carey v. Continental Airlines Inc.,* 823 F.2d 1402 (10th Cir. 1987); *Lee v. Town of Estes Park*, 820 F.2d

1112 (10th Cir. 1987); *Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir. 1983)), it also has held

a store security guard who reported a suspected shoplifter to the police was a state actor where

the officer who made the arrest did not make an independent investigation but relied on the

judgment of the security guard. *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1429 (10th Cir.

1984), *cert. denied in part, granted in part as to other party*, 474 U.S. 818 & 805, 106 S.Ct. 65

& 40, 88 L.Ed.2d 53 & 33 (1985). No state action exists "where a private party is simply

reporting suspected criminal activity to state officials who then take whatever action they believe

the facts warrant," *Lee v Town of Estes Park*, 820 F.2d 1112, 1115 (10th Cir. 1987), but if "there

are allegations that the police officers actually acted under the direction" of a private party, or

the evidence establishes the private party "acted in a concerted manner" with police, there are

sufficient facts from which a jury could find the private party acted under color of law for § 1983

purposes. *Bailey v. Kenney*, 791 F.Supp. 1511, 1522-23 (D. Kan. 1992) (denying summary

judgment to bail bondsman who informed police there was a bond forfeiture at a particular

residence, knocked on the door with the officers, decided they should forcibly enter the

residence, then broke a glass pane on the back door and pointed a gun at plaintiff); *see also*

*Coleman v. Turpen*, 697 F.2d 1341, 1345 (10th Cir. 1982) (finding state action allegations

sufficient to withstand dismissal of § 1983 due process claim against automobile wrecking

company for deprivation of plaintiff's property rights to truck where company "jointly

participated in seizing the truck by towing it away" and because the company's sale of the truck

"was an integral part of the deprivation.").

To demonstrate the assistance Miller provided Smith after Miller's tenure as a

prosecutor, Powell attached as Exhibit 8 to his initial brief in support of his summary judgment

motion the following excerpt of Miller's March 14, 2014 deposition testimony:

A [BY MR. MILLER]: I did him no favors at all. That was the Joe Shells case. I told you that I did – I can't remember how I did it, but I think I told the jailer to take him or make sure he goes to Coalgate jail instead of DOC. I can't really remember how that happened because it was such a pass-in-the-hallway thing that meant nothing to me and that's all.

Q [BY MR. BARRETT]: Subsequent to your leaving the DA's office while you were working for the Durbin firm, you made a call to Clayton Niemeyer in the Oklahoma County District Attorney's Office regarding Derrick Smith?

A: I did.

Q: That's correct?

A: It is correct.

Q: Did you consider that a favor for Derrick Smith?

A: Yes.

Q: So you did do a favor for him?

A: After I left the DA's office. You confined your prior question to before I left. At least that's what I understood you to say.

Q: If you misunderstood it, that's fine. I asked after you left, after you left the DA's office.

A: Let's start right there to make sure I got you right. After I left the DA's office, did I ever do a favor for Derrick Smith?

Q: Correct.

A: Yes, yes.

Q: Tell me what favors you did for him.

A: First of all, I talked to him if he called me. I talked to his girlfriend if she called me. I may have talked to his mama. It seems like I might have. I can't really remember. Just like I did for a lot of people. So those are favors because I didn't have to do that.

I did talk to Shannon Henson. I can't remember exactly the order or sequence of things or how I knew, but somehow I got information that Derrick was on a bad rap in Texas in Wichita Falls. I don't think I talked to Derrick about that. I think I talked to his girlfriend. Anyway, I'm not sure. And I did exactly what I do for a lot of people even today.

I made an inquiry. I did it through Shannon because I knew he was from Wichita Falls, and he made a call and found out that it looked like it was legit. It wasn't what I was hearing that Derrick was in it, not that he was the killer, but that he was in it, and that was it on that one. That's all I did.

Then on the Clayton Niemeyer thing you mentioned, again, I can't remember, Rand, how that happened, but it could have been I actually talked to Derrick on that one. It seems like maybe I did.

Anyway, it's just very vague, but I do remember calling Clayton. I remember telling Clayton who I knew very well that, hey, I'm calling, you remember from this case. He's a stand-up kid. He's had lots of trouble, that kind of thing, but he

did his thing in my case. I just wanted you to know about it when you were
making your recommendation.

      That was not unusual, especially right after I left, the first three or four years
after I left. Nobody even knows I was there now, but at the time people did and
that's what I did.

*See* Miller Deposition [Doc. No. 97-7] at pp. 23-25. By this testimony, Miller appears to

acknowledge not only that he contacted prosecutors on Smith's behalf after leaving the District

Attorney's office for private practice, but also that his status as a former prosecutor was well

known to the state officials with whom he spoke.

      Powell provides support for factually detailed allegations that, after leaving the District

Attorney's office, Miller not only communicated with prosecutors in both Oklahoma and Texas,

but successfully persuaded them to reduce criminal charges against Smith or otherwise obtain

leniency for him. Specifically, there is evidence that after Miller called Clayton Niemeyer

regarding Smith's crack-cocaine trafficking charge, the recommended sentence was reduced

from thirty down to five years for the lesser charge of possession. Likewise, it appears that after

Miller contacted Shannon Henson regarding Smith's arrest for murder in Texas, the charge was

downgraded to aggravated robbery. In both instances, Smith was permitted to have his sentences

run concurrently with the fifteen years he received for beating his girlfriend with a baseball bat.

      As a former assistant district attorney, Miller's actions in contacting then-current

prosecutors concerning a witness whose testimony was central to two high-profile murder

convictions Miller achieved while still a prosecutor himself are readily distinguishable from

those of private citizens unilaterally reporting suspected criminal activity to police. Powell has

provided sufficient record evidence from which a jury could reasonably conclude that Miller,

while known as a prosecutor or former prosecutor, continued to intervene with and exert

influence over government officials in furtherance of a promise of assistance to Smith to ensure the perpetuation of Smith's perjured testimony and the continuation of Plaintiffs' incarceration. There are genuine issues of material fact, however, regarding whether Miller's actions as a private attorney support Plaintiffs' contention he exerted influence over and/or acted jointly with state actors as required to show Miller acted under color of law. The existence of these fact disputes warrant consideration of these § 1983 claims by a jury and render summary judgment in favor of Powell inappropriate.[17]

To support his summary judgment argument that there is an absence of evidence to establish he was a state actor within the meaning of *Brady,* Miller relies on testimony of both Niemeyer and Henson, which he contends establishes they were not influenced by Miller's contacts but used their independent judgment in making prosecutorial decisions vis-a-vis Smith. But that same testimony, in addition to the case file notes and the other circumstances surrounding Smith's plea deals, supports the reasonable inference that Miller did influence Neimeyer and Henson in a manner sufficient to establish the requisite state action. Thus, genuine issues of material fact exist regarding whether Miller actually influenced the officials with whom he spoke regarding Smith or whether the decisions they made concerning the nature of criminal charges to bring against, and prison sentences to recommend for, Smith were fully a product of their own discretion. Given the existence of these factual disputes, summary judgment in favor of Miller on the § 1983 claims is likewise inappropriate.

**Conclusion**

---

[17]Because the Court holds at this stage that Miller may be a state actor under the joint-action test, it does not consider the same facts under the other "color of law" tests. *See Anaya*, 195 F.3d at 596.

For the reasons stated above, the Court finds neither Powell nor Miller are entitled to summary judgment.

IT IS THEREFORE ORDERED that Plaintiff Paris LaPriest Powell's Motion for Summary Judgment [Doc. No. 97, Case No. CIV-2010-1294-D] and Defendant Robert Bradley Miller's Motion for Summary Judgment [Doc. No. 94, Case No. CIV-2010-1294-D; and Doc. No. 92, Case No. CIV-2010-1295-D] are DENIED.

IT IS SO ORDERED this 21st day of April, 2015.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE